**Anne D. NICKOLA, Plaintiff-Appellant,**

v.

**Kenneth PETERSON, d/b/a Kaydee Products Company, Defendant-Appellee.**

No. 76–1916.

United States Court of Appeals, Sixth Circuit.

Argued Nov. 30, 1977.

Decided June 23, 1978.

Rehearing and Rehearing En Banc Denied Oct. 27, 1978.

---

2. Appellant argues that these errors were so prejudicial that they constituted "plain error."

Charles W. Chandler, Gifford, Chandler, Sheridan & Sprinkle, Birmingham, Mich., for plaintiff-appellant.

John K. McCulloch, Saginaw, Mich., for defendant-appellee.

Before CELEBREZZE, Circuit Judge, LIVELY, Circuit Judge, and MARKEY, Chief Judge of the U. S. Court of Customs and Patent Appeals.*

MARKEY, Chief Judge, Court of Customs and Patent Appeals.

Appeal under 28 U.S.C. § 1291 by plaintiff-patentee, Anne D. Nickola (Nickola), from the district court's patent invalidity decision after a six-day jury trial.[1] The complaint against defendant, Kenneth Peterson d/b/a Kaydee Products Company (Peterson), contains count I, alleging infringement of claims 4 and 21 in Nickola's patent,[2] and count II, alleging wrongful use of trade secrets. In a special verdict of fifteen interrogatories, the jury found for Nickola on the patent count and determined her damages as $6,230.00. On the trade secret count, the jury returned a general verdict for Peterson. The district court then granted Peterson's motion for judgment notwithstanding the verdict on the patent count, denied his alternative motion for a new trial, set aside part of the special verdict, declared the two patent claims invalid, and entered judgment for Peterson on both counts. Nickola appeals only the patent invalidity decision. We affirm.

### The Invention

The invention, intended to furnish gas and electric service to individual mobile homes, is the combination of an upright post, with an electric power box, an electric meter, and a heating fuel meter (e. g., a gas meter) mounted on the post.

Fig. 2 in Nickola's patent is reproduced here:

*FIG. 2*

Referring to Fig. 2, the patent describes a mobile home 42, an elongated post 10, "conventional" electric meter 14, "conventional" electric power box 16, electric cable 54 connecting the power box to the mobile home, ground wire 34 connecting "conventional" mobile home ground wire connection 44 to "conventional" underground metal water pipe 40, "conventional" gas meter 78, "conventional" gas pipes 82 and 84, "conventional" telephone box 62, and "conventional" telephone cable 69.

---

\* Honorable Howard T. Markey sitting by designation.

1. 410 F.Supp. 590, 193 USPQ 443 (E.D.Mich. 1976).

2. Reissue Patent No. 27,400, for "Mounting Pedestal For Utilities," granted June 20, 1972 reissuing Patent No. 3,502,785, granted March 24, 1970 on an application filed November 20, 1967.

Claim 4 recites a combination of four structural elements:

"4.  [1] An elongated post mounted in an upright position,

[2] an electrical meter and

[3] an electrical power box mounted on the upper end of said post on opposite sides thereof, [and]

[4] a heating fuel metering means mounted to said electrical meter and said electrical power box."

[Bracketed matter and paragraphing added.]

Claim 21 recites a combination of six structural elements:

"21.  [1] An elongated post mounted in an upright position,

[2] an electrical meter and

[3] an electrical power box mounted to said post,

[4] electrical wires extending upwardly along said post and electrically connected to said meter,

[5] an electrical wire connected to and extending from said power box, and

[6] a heating fuel metering means mounted to said post."

[Bracketed matter and paragraphing added.]

Nickola's company, Adnic Products Co., sells a metal post 8 ft. in length, with an L-shaped mounting plate on one end, bearing the trademark POWER PACK PEDESTAL. The post and an electric power box are sold as a unit.

The buyer (e. g., a mobile home park operator) installs the unit in an upright position by burying approximately half of the post in the ground at a mobile home site. The local utility company provides underground gas and electric service to the post, and also provides and mounts the gas and electric meters on the post.

### The Trial Testimony

Trial was in November, 1975. Nickola, who demanded a jury trial,[3] testified, so far as material here:

That she was manager of a mobile home park; that in about 1960 electric meters for mobile homes were mounted on a "gang rack" at the rear of the park; that in 1960 mobile homes used "bottled gas"; that in about 1965, when gas service became available, the gas meters were also mounted on a gang rack at the rear of the park, with individual underground supply lines running from each gas meter to a mobile home site; that the next event was introduction of an "electrical pedestal" mounting an electric meter at each mobile home, replacing the central gang rack of electric meters; that she then "introduced the first safe pedestal that combined gas and electric."

Nickola told of a mobile home fire in about 1965, when firemen fought against "live gas and a live electric" because they had disconnected the "wrong gas" and "wrong electric" at the gang racks, and that, in conceiving her invention in May, 1966, she "put something together and worked it out where utilities could be on the same device."

Nickola said her first pedestals for gas and electric meters were approved for her park by the local utility (Consumers) and placed in service on December 18, 1967. She consulted a patent attorney, had prepared a "Record of Invention" form dated April 26, 1967, and had filed her original patent application in the Patent Office (now the Patent and Trademark Office) on November 20, 1967 (exhibit 4). She said that, with commercial sales beginning in 1968, "40 to 50,000" units had been sold.

On cross-examination, she answered that the gas meter, the electric meter, and the other devices which can be mounted on the post, each "work independently of the other."

Kenneth DeVerna, long time employee of Consumers and member of its product evaluation committee, testified that, to his knowledge, Nickola's pedestal was the first approved by his company for combined gas and electric service. John D. Gribble, an-

3.  Under Fed.R.Civ.P. 38.

other Consumers employee, gave essentially the same testimony.[4]

When Nickola rested, Peterson moved orally for a directed verdict on the ground that Nickola had not proved infringement. That motion being denied, Peterson testified primarily with respect to infringement and trade secrets. Peterson then presented Francis B. Boyle as "an expert in the art relating to utility pedestals."

In summary, Boyle testified that from 1962 until his retirement in 1972 he had been designing, manufacturing, and installing utility pedestals; that one of his mobile home pedestals was an elongated post mounting an electric meter and an electric power box, as shown in a photograph dated September, 1963; that in 1963 or 1964 "customers" requested him to "put a hole in there [in the post] for the mounting bracket to support a gas meter," that he designed a second utility pedestal like his first, as shown in a photograph dated June, 1966; that Consumers approved his second pedestal for mobile homes on July 8, 1966; that on the same day he visited Nickola and offered to supply his pedestals; that "in the summer of 1966," in his opinion, it would have been "obvious * * * to mount a gas meter and an electric meter and power box on the same pedestal,"[5] though he "didn't like the idea of mounting a gas meter on the same post as an electrical meter" because if "the [gas] pipe broke and there were a spark, it would ignite;" and that his second pedestal is described in U. S. Patent No. 3,450,951 (exhibit 13), for "Outdoor Electrical Meter Box and Service Outlet For Mobile Homes," granted June 17, 1969 on an application filed July 12, 1967.[6]

In rebuttal, Nickola gave her opinion that it would not have been obvious in May, 1966 (her conception date) "to combine both a gas meter and an electric meter on the same post" because gas "was just newly introduced," "there was a lot of opposition," and "people dislike the gas and electric on the same thing because of fires and dangers of that sort." She further stated that Boyle's visit to her occurred in September, 1968 (not on July 8, 1966).

### Motions After The Close of Evidence

■ Peterson again moved orally for a directed verdict on the ground that Nickola had not proved infringement. That motion was denied. Nickola then moved orally for a directed verdict of patent validity, on the ground that Peterson had not overcome the

---

**4.** Nickola presented additional exhibits and seven more witnesses. Discussion of that evidence, directed primarily to infringement, damages, and trade secrets, is unnecessary.

**5.** Nickola's counsel objected to the question which prompted this testimony on the ground that it called for "the ultimate legal conclusion for the Court to make." The district court correctly overruled the objection, citing Fed.R. Evid. 704:

"Rule 704. Opinion on Ultimate Issue

"Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."

**6.** Boyle's patent, cited without objection as prior art by the patent examiner in Nickola's reissue application, depicts in Fig. 1 an electric meter 30 and electric power box 32 mounted on vertical post 12 (other reference numbers deleted):

statutory presumption of validity,[7] and arguing that there had been "no evidence to go to the jury to challenge the validity of the patent under Sec. 102[8] of the Patent Act, the novelty requirement," nor "any competent testimony to go to the jury to challenge the validity of the patent under Sec. 103."[9] In opposition, Peterson argued that the patent was invalid because "the combination of the elements such as electric power boxes and meters and gas meters is really an aggravation [sic, aggregation] of elements * * *, they have no other function among themselves or one upon the other" and because "the mounting of a gas meter on a pedestal which already supports an electric meter and a power box is obvious and was obvious at the time plaintiff made her invention, whenever she made her invention."

The district court denied Nickola's motion for a directed verdict, stating "there are issues of fact to go to the jury as to the validity of the patent."

Aware that the trial judge intended to treat validity as a question of law, after submitting interrogatories to the jury, Nickola moved orally to submit the "issue of validity itself" to the jury because it "can be tried by the jury" under Fed.R. Civ.P. 38. In denying this motion, the district court observed that "it was held," in *Graham v. John Deere Co.*, 383 U.S. 1, 17, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), "the question of patent validity is one of law."

7. 35 U.S.C. § 282 (1970) provides in part:
"§ 282. Presumption of validity; defenses.
"A patent shall be presumed valid. Each claim of a patent (whether in independent or dependent form) shall be presumed valid independently of the validity of other claims; dependent claims shall be presumed valid even though dependent upon an invalid claim. The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting it."
The district court correctly stated, in its jury instructions, that the presumption is "merely a rule of evidence that requires the defendant to prove by clear and convincing evidence" the invalidity of the patent. Like other legal presumptions, that provided for in 35 U.S.C. § 282 merely assigns the burden of proof, as the last (and for that purpose redundant) sentence of the provision makes clear.

8. 35 U.S.C. § 102 (1970) provides:
"§ 102. Conditions for patentability; novelty and loss of right to patent.
"A person shall be entitled to a patent unless—
"(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or
"(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States, or
"(c) he has abandoned the invention, or
"(d) the invention was first patented or caused to be patented by the applicant or his legal representatives or assigns in a foreign country prior to the date of the application for patent in this country on an application filed more than twelve months before the filing of the application in the United States, or
"(e) the invention was described in a patent granted on an application for patent by another filed in the United States before the invention thereof by the applicant for patent, or
"(f) he did not himself invent the subject matter sought to be patented, or
"(g) before the applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed, or concealed it. In determining priority of invention there shall be considered not only the respective dates of conception and reduction to practice of the invention, but also the reasonable diligence of one who was first to conceive and last to reduce to practice, from a time prior to conception by the other."

9. 35 U.S.C. § 103 (1970) provides:
"§ 103. Conditions for patentability; non-obvious subject matter.
"A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the *invention was made to a person having ordi-nary skill* in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made."

The Special Verdict

Of the fifteen interrogatories answered by the jury in its special verdict,[10] these six are material here:

"Interrogatory No. 1

Is plaintiff's claimed invention 'different' from the prior art by its combining an electric power box and an electric meter on an upright elongated post with a fuel metering means, such as a gas meter, as stated in claim no. 4 of Nickola reissue patent no. 27,400?

Answer 'yes' or 'no'.    Answer: *Yes*"

"Interrogatory No. 2

Does the combination of a fuel metering means, such as a gas meter, with an electric meter box, and electric power box, and an elongated pole, as stated in claim no. 4 of Nickola reissue patent no. 27,400, produce a combined result other than the result produced by a fuel metering means, an electric power box, an electric meter, and an elongated pole operating separately?

Answer 'yes' or 'no'.    Answer: *Yes*"

"Interrogatory No. 3

Would a person or ordinary skill in the utility meter and power box mounting art at the time of the claimed invention have found the combined result of a fuel metering means, an electric power box, electric meter and an elongated pole, as stated in claim no. 4 of Nickola reissue patent no. 27,400, to be unusual and unexpected?

Answer 'yes' or 'no'.    Answer: *Yes*"

"Interrogatory No. 4

Is plaintiff's claimed invention 'different' from the prior art by its combining electrical wiring, some of which runs upwardly along the upright pole and electrically connects to the electric meter, and some of which is connected to and extends from the power box, with the electric meter, electric power box, and fuel metering means as set forth in claim no. 21 of Nickola reissue patent no. 27,400?

Answer 'yes' or 'no'.    Answer: *Yes*"

"Interrogatory No. 5

Does the combination of an electric meter and an electric power box with associated electrical wiring, a post, and a heating fuel metering means as set forth in claim no. 21 of reissue patent no. 27,400 produce a combined result differing from the results produced by the electric meter and power box with associated wiring, a post, and a heating fuel metering means operating separately?

Answer 'yes' or 'no'.    Answer: *Yes*"

"Interrogatory No. 6

Would a person of ordinary skill in the utility meter and power box mounting art at the time of the claimed invention have found the combined result of electric wiring, a fuel metering means, an electric power box, electric meter box, and an elongated pole, as stated in claim No. 21 of Nickola reissue patent no. 27,400, to be unusual and unexpected?

Answer 'yes' or 'no'.    Answer: *Yes*"[11]

Motion For Judgment Notwithstanding
The Verdict

Peterson filed a written motion for judgment notwithstanding the verdict,[12] or alternatively for a new trial, accompanied by an extensive memorandum asserting "invalidity, as a matter of law."

The District Court

With its order granting Peterson's motion for judgment n. o. v., denying the alternative motion for new trial, setting aside the jury's answers to interrogatories 2, 3, 5, and 6 (and 15, setting damages at $6,230.00), declaring the two patent claims invalid, and entering judgment for Peterson, the district court filed an opinion containing:

[1]

"In order to be patentable, any claimed invention must satisfy the requirement of

---

10.  See Fed.R.Civ.P. 49(a).

11.  The jury was not asked at any point to define or describe the "combined result" referred to in interrogatories 2, 3, 5, and 6; nor was the jury asked to answer "yes" or "no" to any question spelling out a specific "combined result."

12.  Under Fed.R.Civ.P. 50(b).

'novelty.' This requirement is the *sine qua non* of patentability. 35 U.S.C. § 101.[13] Since plaintiff does not claim to have invented either the gas meter, the electric meter, or the electric power box, but claims to have invented the combination of those elements in her Power Pack Pedestal, the element of novelty if such there is must reside in the combination of those elements. *Anderson's Black Rock, Inc. v. Pavement Salvage Co.*, 396 U.S. 57, 90 S.Ct. 305, 24 L.Ed.2d 258 (1969)." [410 F.Supp. at 593, 193 USPQ at 445.]

[2]

"The issue of novelty was submitted to the jury in interrogatories numbers 2. and 5. The jury by answering 'yes' to each found that patent claim no. (4) and patent claim (21) both satisfied the novelty requirement. In viewing the evidence in the light most favorable to plaintiff, and drawing all reasonable inferences in her favor, the Court finds the conclusions of the jury to be unwarranted.

"Although a patent is presumptively valid, this presumption has no independent evidentiary weight. *Sperberg v. Goodyear Tire & Rubber Co.*, 519 F.2d 708 (CA 6, 1975) [*cert. denied*, 423 U.S. 987, 96 S.Ct. 395, 46 L.Ed.2d 303 (1975)]. Since the Court finds no evidence from which a jury could reasonably conclude that the novelty requirement of 35 U.S.C. § 101 was satisfied and substantial evidence that it was not satisfied, defendant's motion for judgment notwithstanding the verdict will be granted. *Gillham v. Admiral Corp.*, 523 F.2d 102 (CA 6, 1975) [*cert. denied*, 424 U.S. 913, 96 S.Ct. 1113, 47 L.Ed.2d 318 (1976)]." [*Id.* at 593–94, 193 USPQ at 445–46.]

[3]

"Likewise, this Circuit has recently restated the rule that every element of a combination invention must cooperate to produce a new result in order for there to be novelty within the meaning of 35 U.S.C. § 103. *Phillips Industries, Inc. &*

Mobil Temp, Inc. v. State Stove & Manufacturing Co., Inc. [522 F.2d 1137 (6th Cir. 1975)]. The uncontroverted evidence before the Court is that there is no cooperation between the elements in plaintiff's claimed invention and that no cooperative result is produced other than the sum of the independent functions of those elements. Accordingly, the patent claims in issue will be held invalid for lack of novelty. 35 U.S.C. § 101." [*Id.* at 595, 193 USPQ at 446–47.]

[4]

"Whether persons of ordinary skill in the art disagree as to the safety of a product or techniques does not determine the issue of obviousness. The issue regarding obviousness is whether the differences embodied in a combination product and the result so produced would have been non-obvious to a person of ordinary skill in the art, not whether there was a controversy over whether such was safe. *In re Jansen*, 525 F.2d 1059 [, 187 USPQ 743] (Cust. & Pat.App., 1975) [, *cert. denied*, 425 U.S. 972, 96 S.Ct. 2170, 48 L.Ed.2d 796 (1976)]." [*Id.* at 596, 193 USPQ at 447.]

[5]

"Since the Court finds no evidence on which a finding of non-obviousness could be based, the Court will grant defendant's motion for judgment notwithstanding the verdict on interrogatories number (3) and number (6). In these interrogatories, the jury had answered that a person of ordinary skill in the art would have considered the result produced by the claimed combination inventions to be unusual and surprising." [*Id.*, 193 USPQ at 448.]

[6]

"In sum, the Court finds contrary to the determinations of the jury that the patent claims at issue are invalid both for lack of novelty and because of obviousness. Although the Court is reluctant to

---

13. 35 U.S.C. § 101 (1970) provides:

"§ 101. Inventions patentable.

"Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title."

set aside the determinations of a jury, the Court recognizes that patent validity is primarily a question of law. *Dickstein v. Seventy Corp.*, 522 F.2d 1294 (CA 6, 1975) [*cert. denied,* 423 U.S. 1055, 96 S.Ct. 787, 46 L.Ed.2d 644 (1976)]; *Monroe Auto Equipment Co. v. Heckethorn Manufacturing & Supply Co.*, 332 F.2d 406, 411 (CA 6, 1964) [*cert. denied,* 379 U.S. 888, 85 S.Ct. 160, 13 L.Ed.2d 93 (1964)]. In determining the issue of validity, the Court is bound to scrutinize patented combinations of old elements with special care due to the improbability of finding a patentable invention in an assembly of old elements, *Phillips Industries, Inc. & Mobil Temp., Inc., v. State Stove & Manufacturing Co., Inc.*, 522 F.2d 1137 (CA 6, 1975); and because of the 'blight' on free commerce which is imposed by an invalid patent. *Hieger v. Ford Motor Co.*, 516 F.2d 1324 (CA 6, 1975) [*cert. denied,* 423 U.S. 1056, 96 S.Ct. 788, 46 L.Ed.2d 645 (1976)]." [*Id.* at 596–97, 193 USPQ at 448.]

### The Issue

The dispositive issue is whether the district court erred in granting Peterson's motion for judgment n. o. v.

### OPINION

**I. Statutory Basis of the Novelty Requirement**

▮ The statement that 35 U.S.C. § 101, *supra* note 13, sets forth the "novelty· requirement" for patentability was in error. That section does employ the term "new," a synonym for "novel." Section 101, however, is a general statement of what may be patented ("process, * * * improvement thereof"). The words "new" and "useful," appearing twice, merely indicate the broad concept that a patent may not be obtained on that which is old or useless. Section 101 does not specify the conditions for patentability. The "requirements" (conditions) broadly referred to in § 101, including the requirement for "novelty," are set forth elsewhere in the statute.[14]

Congress accomplished the task of defining "new," i. e., of setting forth the "novelty requirement," in the succeeding section, 35 U.S.C. § 102, *supra* note 8, entitled *"Conditions* for patentability; *novelty* and loss of right to patent." (Emphasis added.) Thus, as the Ninth Circuit stated in *Reeves Instrument Corp. v. Beckman Instruments, Inc.*, 444 F.2d 263, 270, *cert. denied,* 404 U.S. 951, 92 S.Ct. 283, 30 L.Ed.2d 268 (1971), "[t]he requirement of novelty is more specifically defined in 35 U.S.C. § 102 * * ." With the term carefully spelled out by Congress in § 102, no warrant exists for looking to the broad, undefined word "new" in § 101 for understanding or application of the novelty requirement. There being a clear statutory base for the novelty requirement in § 102, judicial application of the novelty requirement should focus on that specific provision.[15]

---

**14.** Patent cases being relatively infrequent, comments of potential applicability may be found in "Judges' Primer: Patent and Copyright Law and Procedure" in Part VIII of *Seminars For Newly Appointed U.S. District Judges* (1970–71, Federal Judicial Center, Washington, D. C.), and "Special Problems in Patent Cases," 66 F.R.D. 529 (1975) (reprinted in 57 J.Pat.Off. Soc'y 675 (1975)) presented at the Federal Judicial Center, October 16, 1974. For discussion of jury trials in patent cases, see Ropski, *Constitutional and Procedural Aspects of the Use of Juries in Patent Litigation* (pts. I–II), 58 J.Pat.Off.Soc'y 609, 673 (1976).

**15.** "The novelty required is not novelty in an absolute sense, as the statute defines what is to be looked to in order to show that an invention is not new." Federico, "Commentary On The New Patent Act [of 1952]" in 35 U.S.C.A. p. 1, at p. 17 (1954). Thus, prior public knowledge or use in a foreign country would destroy novelty if the novelty requirement resided merely in the word "new" in the absolute sense in which it appears in § 101, whereas Congress has provided in § 102 that such foreign circumstances do not destroy novelty under the statute. Similarly, under proper circumstances, a person may be entitled to a patent, even though that person was not the first to make the invention. *See, e. g., Horwath v. Lee*, 564 F.2d 948, 195 USPQ 701 (Cust. & Pat.App.1977) (first inventor suppressed or concealed the invention; therefore, second inventor entitled to priority under 35 U.S.C. § 102(g)).

Legislative history is in accord. S.Rep. No.1979, 82nd Cong., 2d Sess. (1952) states at p. 5, U.S.Code Cong. & Admin.News 1952, pp. 2394, 2399,

"Section 101 sets forth the subject matter that can be patented, 'subject to the conditions and requirements of this title.' The conditions under which a patent may be obtained follow, and *section 102 covers the conditions relating to novelty.*" [Emphasis added.]

then at p. 6, U.S.Code Cong. & Admin.News 1952, p. 2399,

"*Section 102, in general, may be said to describe the statutory novelty required for patentability, and includes, in effect, an amplification and definition of 'new' in section 101.*" [*Emphasis added.*]

and finally at p. 17, U.S.Code Cong. & Admin.News 1952, p. 2409 in the "Revision Notes,"

"The corresponding section of existing statute is split into two sections, section 101 relating to the subject matter for which patents may be obtained, and *section 102 defining statutory novelty* and stating other conditions for patentability." [Emphasis added.]

Statements identical to the foregoing appear in H.R.Rep.No.1923, 82nd Cong., 2d Sess. (1952) at pp. 6, 7, and 17, respectively.

As stated in *In re Bergstrom,* 427 F.2d 1394, 1401, 57 CCPA 1240, 1249, 166 USPQ 256, 262 (1970):

"[T]he criteria for determining whether given subject matter is 'new' within the meaning of § 101 are no different than the criteria for determining whether that subject matter possesses the 'novelty' expressed in the title of § 102. The word 'new' in § 101 is defined and is to be construed in accordance with the provisions of § 102. Thus, that which possesses statutory novelty under the provisions of § 102 is also new within the intendment of § 101. We have found no evidence of Congressional intent to define the word 'new' as used in § 101 in any different manner." [Footnote omitted.]

## II. Peterson Did Not Carry His Burden of Proving Lack of Novelty

Considering the finding of "no evidence from which a jury could reasonably conclude that the novelty requirement * * * was satisfied and substantial evidence that it was not satisfied" (410 F.Supp. at 594, 193 USPQ at 446) inconsistent with the jury's answers to interrogatories 2 and 5, *supra,* the court set those answers aside.

■ The no-evidence-of-novelty finding cannot stand in the absence of record evidence: (1) that the identical invention, i. e., the precise *combination* of structural elements recited in each claim, "was known or used by others in this country * * * before the invention thereof by [Nickola]" (§ 102(a)); or (2) that the identical invention recited in each claim was "in public use or on sale in this country, more than one year prior to the date of [Nickola's] application" (§ 102(b)).[16] No such evidence is of record.

■ The "substantial evidence," referred to as defeating novelty, was not specified. Peterson's only evidence touching novelty was Boyle's testimony that "customers" had requested him to make holes for a gas meter bracket in some of his electric meter pedestals. Boyle did not testify that he had ever seen a gas meter so mounted. There was no evidence that any customer had actually mounted a gas meter on a Boyle pedestal and no evidence that the utility company had given the required approval for any such mounting. There was thus no evidence that gas meters had been mounted on electric meter pedestals before Nickola's invention, i. e., that Nickola's *combination* was old. Peterson's evidence to show lack of novelty was thus wholly inadequate to meet his burden under § 102.

Peterson having failed to meet his burden, evidence of novelty was unnecessary. 35 U.S.C. § 282, *supra* note 7. Nonetheless, Nickola's utility witnesses testified without challenge that Consumers had not approved a combination gas and electric pedestal be-

---

**16.** The other subsections of § 102 have no application to the facts of this case.

fore approving Nickola's in December, 1967. Were it necessary to evaluate the evidence, therefore, the novelty of Nickola's particular claimed combination would appear unquestionably established.

In all events, novelty is a question of fact, as discussed below, and it is clear that the evidence touching upon novelty, such as it was, was sufficient to have been submitted to the jury. Under such circumstances, a conclusion that no reasonable juror could have found the inventions recited in claims 4 and 21 to have been novel constitutes an error of law.

### III. New Result v. Novelty

Though the jury's answers to interrogatories 2 and 5 were set aside, on the theory that they were inconsistent with a lack of novelty finding, 2 and 5 were not the material interrogatories on the novelty issue. Those interrogatories were directed to a different question—whether the inventions "produce a combined result" other than (interrogatory 2), or differing from (interrogatory 5), "the result produced by [the individual structural elements] operating separately." Thus, interrogatories 2 and 5 are concerned with the overall *function* or *operation* of the combination of individual structural elements, not with the novelty of the combination itself.

The function of the combination can be material, not on the novelty issue, but on the separate and distinct issue of nonobviousness (35 U.S.C. § 103, *supra* note 9).

The view that "novelty" was covered in interrogatories numbers 2 and 5 and that there must be "a new result in order for there to be novelty within the meaning of 35 U.S.C. § 103",[17] intermixed the question of novelty (whether the particular *combina-*

*tion* claimed had existed before Nickola made it) with one of the indicia (a "new" or "unexpected" result) sometimes useful in determining the entirely different question of nonobviousness. The distinction is important, for patent law is entirely statutory and there is not a word in the statute requiring a new result or a new function as a condition of patentability. Indeed, a requirement that the result must itself be novel would nullify the statutory provision encouraging disclosures of "new and useful improvements thereof." 35 U.S.C. § 101.

Most patents are granted on improvements of prior devices;[18] and the improved device will inherently achieve the same basic result as that achieved, and will perform the same basic function as that performed, by the prior device. An improved jet engine, for example, necessarily achieves the same result and performs the same function—propulsion—as that achieved by prior jet engines, yet it may constitute a "new and useful improvement" entitled to the protection provided by our patent laws, 35 U.S.C. § 101, as an incentive to make and disclose improvements in prior devices. Similarly, the result achieved by the horse, the automobile, and the airplane is the same —transportation. Only the speed of achievement varies. Yet it may be supposed that one unaware of the statute and its constitutional background would recognize the airplane as a patentable improvement over the horse and the automobile. To require in every case that a new "function" or new "result" be performed or achieved, would be destructive of "the progress of * * * useful arts" goals sought in the constitutional-statutory scheme.

The interrogatories relating to novelty were numbers 1 and 4, which were not

---

17. The opinion below includes the statement that "this Circuit has recently restated the rule that every element of a combination invention must cooperate to produce a new result in order for there to be *novelty* within the meaning of 35 U.S.C. 103" (410 F.Supp. at 595, 193 USPQ at 446–47, emphasis added), citing *Philips Industries Inc. v. State Stove & Manufacturing Co., Inc., supra. Philips Industries* involved no question of novelty in the combination claimed.

18. In *General Electric Co. v. Wabash Appliance Corp.*, 304 U.S. 364, 368, 58 S.Ct. 899, 901, 82 L.Ed. 1402 (1938), the Court noted congressional recognition that "most inventions represent improvements on some existing article, process or machine * * *." More than 70,000 patents are currently issued each year. *Commissioner of Patents and Trademarks Annual Report, Fiscal Year 1976* (1977).

disturbed. Those interrogatories inquired whether the inventions were "different" from the prior art, i. e., whether Nickola's combination was "novel" in the statutory sense.[19] 35 U.S.C. § 102. The jury answered "yes"; and in the absence of record evidence indicating the presence of the claimed combination in the prior art, that answer was correct.

■ Though it was error to hold Nickola's patent claims invalid for lack of novelty, the district court did not err in its grant of judgment n. o. v., for novelty alone will not render an invention patentable. Some new and useful inventions are patentable. Some are not. To be patentable a new and useful invention must meet the third requirement—nonobviousness—set forth in 35 U.S.C. § 103.[20]

## IV. Nonobviousness v. Novelty

Confusion of the novelty requirement defined in § 102 with the nonobvious subject matter requirement defined in § 103 is avoided when the statutory sections are applied in proper sequence. The starting point in applying § 103 is the recognition that the claimed invention—the claimed subject matter as a whole—is novel under § 102. If the claimed subject matter be old, consideration of § 103 is unnecessary. The first clause of § 103 states that: "A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title." The heart of § 103 then follows, "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."

Though, early on, the opinion below correctly stated, "novelty if such there is must reside in the combination of those elements," (410 F.Supp. at 593, 193 USPQ 445) citing *Anderson's-Black Rock, Inc. v. Pavement Salvage Co., Inc.,* 396 U.S. 57, 90 S.Ct. 305, 24 L.Ed.2d 258 (1969), it later stated, incorrectly, that "the determination of novelty for combination inventions does not turn on whether the old elements are arranged in a new manner which serves some useful function but on whether the function produced by that arrangement is itself new." (410 F.Supp. at 595, 193 USPQ at 446.) As above stated, a requirement for a

---

**19.** "[A] device lacks novelty if there is, or has been, a substantially identical prior device." *Monroe Auto Equip. Co. v. Heckethorn Mfg. Co.,* 332 F.2d 406, 414 (6th Cir.), *cert. denied,* 379 U.S. 888, 85 S.Ct. 160, 13 L.Ed.2d 93 (1964).

**20.** There is no requirement that a court find "invention" present. The difficulty experienced by courts in defining that amorphous, ephemeral, indefinable label was noted by the Court in *Graham v. John Deere Co.,* 383 U.S. 1, 11–12, 86 S.Ct. 684, 690, 15 L.Ed.2d 545 (1966):

"The language in the case [*Hotchkiss v. Greenwood,* 52 U.S. (11 How.) 248, 267, 13 L.Ed. 683 (1850)], and in those which followed, gave birth to 'invention' as a word of legal art signifying patentable inventions. Yet, as this Court has observed, '[t]he truth is the word ['invention'] cannot be defined in such manner as to afford any substantial aid in determining whether a particular device involves an exercise of the inventive faculty or not.' *McClain v. Ortmayer,* 141 U.S. 419, 427, 12 S.Ct. 76, 78, 35 L.Ed. 800 (1891); *A. & P. Tea Co. v. Supermarket Corp.,* [340 U.S. 147] at 151, 71 S.Ct. 127 at 129, 95 L.Ed. 162. Its use as a label brought about a large varie-

ty of opinions as to its meaning both in the Patent Office, in the courts, and at the bar." That difficulty led Congress, 26 years ago, Patent Act of 1952, 66 Stat. 792 (enacting Title 35, U.S.Code), to specify nonobviousness of the subject matter as a whole to one skilled in the art at the time the invention was made as the "new statutory formulation" (*John Deere, Id.* 383 U.S. at 12, 86 S.Ct. 684) of the third requirement for patentability. Congress further mandated that "invention" should henceforth refer to the "invention or discovery" (35 U.S.C. § 100(a)), i. e., the *thing* invented or discovered. Difficulties since 1952 have centered on inapt references to old cases calling on courts to find "invention," and on judicial efforts to supply semantic mechanisms as aids in defining "obviousness." Because inventions differ so widely, application of all such mechanisms to all inventions, as rules of law, would risk destruction of *the entire statutory scheme. See note 22, infra.* Exercise of the judicial process, in determining whether an invention has met the nonobviousness requirement, turns on application of the entire statutory provision, 35 U.S.C. § 103, to all relevant evidence of record.

new function would nullify the statutory provision for patenting "improvements" which necessarily perform the old function of the now-improved device.

As authority for the view that a new function must be found, the opinion below quoted this part of the opinion in *Anderson's-Black Rock, supra,* 396 U.S. at 62, 90 S.Ct. at 308:

"We conclude that while the combination of old elements performed a useful function,[4] it added nothing to the nature and quality of the radiant-heat burner already patented.

[4] 35 U.S.C. § 101 provides:

"'Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title.'

"Absent here is the element 'new.' For as we have said, the combination patent added nothing to the inherent characteristics or function of the radiant-heat burner."

The sole issue in *Anderson's-Black Rock* was nonobviousness, not novelty. The Court stated that "[i]n this case the question of patentability of the combination turns on the meaning of 35 U.S.C. § 103 which the court reviewed in the *Graham* [*v. John Deere Co.*] case [383 U.S. 1], at 13–17, 86 S.Ct. [684] 691–693 [15 L.Ed.2d 545] [1966]," (396 U.S. at 61–62, 90 S.Ct. at 308, footnote omitted) and "[w]e conclude that the combination was reasonably obvious to one with ordinary skill in the art" (*Id.* at 60, 90 S.Ct. at 307).

The patentee-respondent in *Anderson's-Black Rock* had argued, as evidence of nonobviousness, that its invention "involves a combination of prior art which produces the new and useful *result* [emphasis added] of eliminating the cold joint" in asphalt pavements. (*Id.* at 59, 90 S.Ct. at 307.) The patentee was arguing that the *combination* of structural elements, when operating in the intended way, produced an unexpected result, and that this was evidence of nonobviousness of the combination.

The quote from *Anderson's-Black Rock* in the opinion below related entirely to one element, the radiant-heat burner, not to the claimed combination. In footnote 4, the Court merely stated that the combination added nothing to the function of the radiant-heat burner element. Whatever relevance an added function of the *burner* may or may not have had to determination of obviousness in the combination, the Court was not saying that the total *combination* of structural elements lacked "novelty." Nor was the Court destroying the § 101 provision for "improvements" by substituting its own rule of law, i. e., by adding to the statute a requirement that an invention must perform a new function as a condition of patentability.

The findings below, that "there is no cooperation between the elements in plaintiff's claimed invention" and that "no cooperative result is produced other than the sum of the independent functions of those elements," (410 F.Supp. at 595, 193 USPQ at 447), were cited as a second ground for holding the claims invalid "for lack of novelty." Nickola admitted that no "cooperation" occurs between the individual structural elements, and that no "cooperative result" is produced; but those facts do not support a holding that the claims are invalid "for lack of novelty."

█ Lack of cooperation, like the result achieved or function performed, is not material on the issue of novelty, though it may be material on the issue of nonobviousness. The elements needn't "cooperate," or produce a "cooperative result," for the combination *per se* to be novel. To conclude that a combination lacks novelty because its elements don't cooperate is to find novelty lacking without regard to the prior art, and is improper under the statute. *Cf. Reeves Instrument Corp. v. Beckman Instruments, Inc., supra,* 444 F.2d at 270.

█ The issues of novelty and nonobviousness differ in another regard. As appears below, the issue of obviousness-nonobviousness is ultimately determined as a conclusion of law, involving as it does, consideration of the subject matter of invention as a whole (sometimes including the result achieved and function performed as part of

the "whole"), and consideration of a legal ghost called "a person having ordinary skill in the art" (like the "reasonable man" ghost in negligence cases). Novelty and utility, on the other hand, are determinable as issues of fact. The invention is either new and useful or it is not. The amount of newness and usefulness need be only miniscule to avoid a finding of lack of novelty. That miniscule difference may or may not indicate that the invention as a whole would have been obvious, but it cannot indicate that the invention was old at the time it was made. So here, a miniscule difference, adding a gas meter, made Nickola's combination novel. On the basis of all the evidence, however, as we shall see, the combination, the subject matter as a whole of the invention, would have been obvious, as a matter of law, to a person having ordinary skill in the art.

### V. Obviousness Is A Question of Law

[8]   The Supreme Court settled the question in *Graham v. John Deere Co., supra,* 383 U.S. at 17, 86 S.Ct. at 694, where it stated: "While the ultimate question of patent validity is one of law, *A. & P. Tea Co. v. Supermarket Corp.,* [340 U.S. 147,] at 155, 71 S.Ct. [127] at 131, [95 L.Ed. 162, 1950], the § 103 condition, which is but one of three conditions, each of which must be satisfied, lends itself to several basic factual inquiries."

This court has consistently held obviousness an ultimate conclusion of law reviewable by an appellate court. *Dickstein v. Seventy Corp.,* 522 F.2d 1294, 1297 (6th Cir. 1975), *cert. denied,* 423 U.S. 1055, 96 S.Ct. 787, 46 L.Ed.2d 644 (1976); *Monroe Auto Equip. Co. v. Heckethorn Mfg. Co.,* 332 F.2d 406, 411 (6th Cir.), *cert. denied,* 379 U.S. 888, 85 S.Ct. 160, 13 L.Ed.2d 93 (1964).

In *Kolene Corp. v. Motor City Metal Treating, Inc.,* 440 F.2d 77, 81 (6th Cir.), *cert. denied,* 404 U.S. 886, 92 S.Ct. 203, 30

L.Ed.2d 169 (1971), the point was explained with particular reference to the *Graham v. John Deere Co.* standards for determining obviousness under § 103:

"The question of 'obviousness' in determining patent validity is a mixed question of both fact and law. *Kaiser Industries v. McLouth Steel Corp.,* 400 F.2d 36, 41 (6th Cir.); *National Filters, Inc. v. Research Products Corp.,* 384 F.2d 516 (5th Cir.); *Hensley Equipment Co. v. Esco Corp.,* 375 F.2d 432 (9th Cir.). In ruling on that question the Supreme Court said:

'(1) Under § 103, the scope and content of the prior art are to be determined;

'(2) Differences between the prior art and the claims at issue are to be ascertained;

'(3) And the level of ordinary skill in the pertinent art resolved.

'(4) Against this background, the obviousness or nonobviousness of the subject matter is determined.

'(5) Such secondary considerations [21] as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy.' [Note: Clauses separated and numbered for convenience.] *Graham v. John Deere Co.,* 383 U.S. 1, 17, 86 S.Ct. 684, 694, 15 L.Ed.2d 545.

"When the District Court determines items numbered 1, 2 and 3, it makes findings of fact which are binding on appeal unless the findings are clearly erroneous. Rule 52(a), Fed.R.Civ.P. It is the ultimate determination of the trial judge (item number 4 above) which is a conclusion of law with which this Court

---

21. The adjective "secondary" could not have meant that determination of obviousness-nonobviousness can be made in disregard of step (5) considerations when they are present. Failure to consider all relevant evidence would be both unjust and injudicious. Moreover, when a

conclusion of nonobviousness is reached at step (4) there is no need to consider step (5). Hence, if it were permissible to reach a conclusion of obviousness without consideration of the evidence in step (5), the latter would never be considered.

may disagree based on the established findings of fact. See *Monroe Auto Equipment Co. v. Heckethorn Mfg. & Sup. Co.,* 332 F.2d 406 (6th Cir.), cert. denied, 379 U.S. 888, 85 S.Ct. 160, 13 L.Ed.2d 93."

## VI. The Merits of the Nonobviousness Issue

■ In setting aside the jury's answers to interrogatories 3 and 6, the district court correctly stated the standards for determining obviousness under 35 U.S.C. § 103 (410 F.Supp. at 595, 193 USPQ at 447):

"The standards for determining obviousness under 35 U.S.C. § 103 were established by the Supreme Court in *Graham v. John Deere Co.,* 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), and reiterated by this Circuit in *Bolkcom v. Carborundum Co.,* 523 F.2d 492, 500 (CA 6, 1975) [*cert. denied,* 425 U.S. 951, 96 S.Ct. 1725, 48 L.Ed.2d 194 (1976)]:

' "Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved.

Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented." ' " [22]

On the merits of the nonobviousness issue, we agree with the following portion of the district court's opinion (410 F.Supp. at 595–96, 193 USPQ at 447):

"Applying these [*Graham v. John Deere Co.*] standards to the evidence produced at trial, the Court finds that a jury could not reasonably have concluded that either of the claimed inventions set forth in claims nos. (4) and (21) of plaintiff's Reissue Patent would have been nonobvious to a person of ordinary skill in the art. From plaintiff's testimony, it is plain that the mounting of both electric meters and gas meters on posts [i. e., in gang racks] was the established practice prior to her claimed invention. Part of the prior art was the combination of an electric meter and electric power box on

**22.** The last sentence of the quoted paragraph is, "As indicia of obviousness or nonobviousness, these inquiries may have relevancy."

In portion [6] of the opinion below, quoted *supra,* reference is made to "the improbability of finding a patentable invention in assembly of old elements." Because virtually *every* invention is an assembly of old elements, *see Reeves Instrument Corp. v. Beckman Instruments, Inc., supra,* 444 F.2d at 270 n. 4; *Reiner v. I. Leon Co.,* 285 F.2d 501, 503 (2d Cir. 1960); *B. G. Corp. v. Walter Kidde & Co.,* 79 F.2d 20, 21 (2d Cir. 1935), the statement cannot be universally applied without risk of destroying the patent system. Unable to create from nothing, man must use old elements, which must perform their normal individual functions. A valve must valve; an electrical capacitor must exhibit capacitance; etc.

Similarly, the opinion below elsewhere refers to "combination" inventions and to "combinations of old elements," as though the statute were to be applied differently to "combination" inventions. Court opinions referring to "combination" inventions have not clearly distinguished patentability criteria applicable to different types of inventions. The statute makes no such distinction in patentability criteria (the

word "combination" appears only in 35 U.S.C. § 112, dealing with claim interpretation, and in 35 U.S.C. § 271(c), dealing with contributory infringement). From the facts in some cases, the reference to "combination" may have been intended to separate mechanical or machine inventions from chemical, electrical or process-type inventions. But the statute makes no such distinction; and chemical inventions are normally combinations of chemical elements, electrical inventions are combinations of electrical circuit elements, and process inventions are combinations of steps. No statutory warrant appears, therefore, for treating the patentability of "combination" inventions differently in law from the patentability of some other type of invention undescribed and undefined.

The opinion below considered the "differences * * * and the result," in compliance with the statutory requirement that "the subject matter as a whole" be considered, 35 U.S.C. § 103, and with the same requirement in *John Deere* for determination of "the obviousness or nonobviousness of the subject matter." Thus was avoided the error of determining only whether the particular differences would themselves have been obvious or nonobvious.

one post, as was constructed by Mr. Boyle in an unpatented form since 1962, which is prior to the date of plaintiff's claimed invention. It was also common practice to mount more than one electric meter on a post, as is shown by the statements in plaintiff's original patent, no. 3,502,785, issued March 24, 1970.

"The only difference between plaintiff's claimed invention and the prior art is that plaintiff's device mounted an electric and a fuel meter with a power box on a post rather than many electric meters or just an electric meter and a power box.

"From the state of prior art it is clear that it was obvious to a person of ordinary skill in the art that a post could be made to support both a gas and an electric meter." [23]

We agree also with the district court's holding, in this particular case that obviousness did not depend on "whether there was a controversy over whether such was safe." (410 F.Supp. at 596, 193 USPQ at 447.) That is not to say, however, that a safety controversy can never constitute evidence relevant to a determination of nonobviousness.

If others had recognized the advantage and dangers in mounting both electric and gas meters on a single post at each mobile home site, but had been unable to devise a means for achieving the advantages while avoiding the dangers, and if Nickola's contribution to the progress of the useful arts had been such means, evidence of a safety controversy would have been eminently relevant to the determination of obviousness of those means. When others in the field say "it won't work," that fact is strong evidence that whatever does work would

have been nonobvious. *See United States v. Adams,* 383 U.S. 39, at 44 and 52, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966). The outcome might have been different here if the inventor had contributed something that unlocked a safety puzzle. If here, for example, Nickola had in some manner rendered safe a previously unsafe combination, the fact that no one thought safety achievable would be strongly probative of nonobviousness.

Here, however, no one said, "it won't work." Mounting of electric meters and boxes on a single post at mobile home sites was old and the advantages of so mounting all meters were recognized. Others thought that adding a gas meter would not be safe, not that it would not "work." Nickola merely added the gas meter, doing nothing unconventional to make the combination safe.[24] The district court recognized the presence of a similar fact pattern in *In re Jansen,* 525 F.2d 1059, 187 USPQ 743 (Cust. & Pat. App. 1975), *cert. denied,* 425 U.S. 972, 96 S.Ct. 2170, 48 L.Ed.2d 796 (1976), wherein the inventor combined vitamin $B_{12}$ and folic acid in specific quantities, against expert opinion that the preparation would be unsafe medication. The inventor did nothing to render the combination safe, but claimed merely the combination itself, which was old except for the quantities involved. The change in quantity was held to have been obvious in view of all the evidence, and, the invention not being directed to a means achieving safety in the face of safety objections, evidence of those objections was considered non-probative. So too, evidence of a safety controversy in the present case is without probative value.

---

**23.** The opinion below includes the statement that there was "no evidence on which a finding of non-obviousness could be based". (410 F.Supp. at 596, 193 USPQ at 448) The better statement would have been that there was "no evidence sufficient to rebut that offered by Peterson in support of a legal conclusion of obviousness." Absent facts established by him who has the burden of proving obviousness, 35 U.S.C. § 282, evidence on which to base a legal conclusion of nonobviousness is unnecessary.

**24.** Pointing to claim 4, Nickola says mounting the gas meter below the electric meter shortens the gas inlet exposure above the ground. There was no evidence of what specific events cause dangers. In any event, it would have been obvious that a short pipe provides less exposure than a long pipe. The district court correctly recognized that the low mounting feature is incapable in this case of satisfying the requirement for nonobviousness.

The district court correctly found the evidence of long-felt need insufficient. As Nickola testified, she made her invention immediately after "gas was newly introduced," and there was no evidence that others had even tried to fill a need for a post-electric meter-gas meter combination.

The district court correctly found the commercial success evidence also insufficient in this case. That determination was based on the view that: "The commercial success of the product is accounted for by plaintiff's patent monopoly [25] and the introduction of underground wires and piped natural gas to mobile home parks." (410 F.Supp. at 596, 193 USPQ at 448.) Absent demand for a product, however, there can be no commercial success. No patent can itself create market demand. A patent on the unwanted is worthless. The advent of piped gas was equally irrelevant as a cause for commercial success, because, as the testimony showed, the gas could have been and was piped to a central rack on which gas meters were mounted. To the extent that the court had in mind Nickola's early start with her product, promptly after gas was available to mobile parks, as the cause for her sales, the statement would apply to the evidence, but neither the existence (or non-existence) of the patent, nor the mere availability of gas, could account for purchasers' decisions to buy Nickola's product.

The primary reason for failure of the commercial success evidence in this case is its inadequacy. That evidence consists entirely of Nickola's statement that "40 to 50 thousand" units had been sold over a period of seven or eight years. An average of only 6,000 to 7,000 sales annually would not constitute a "rush to the invention" probative of nonobviousness. There was no evidence that a fortune had been waiting in the wings for him who first made the invention available to the public. It is that waiting fortune which implies that if the invention had been obvious it would surely have been earlier made. Further, there was no evidence of total demand, the extent to which that demand was met by the patented product, the extent to which the market abandoned earlier products in favor of the product patented, the extent to which advertising contributed or did not contribute to sales, and the like. In short, Nickola's commercial success evidence did not rise to the level of an indicium of nonobviousness listed as potentially relevant in *Graham v.*

**25.** The reference to a "patent monopoly" is not uncommon. Others, particularly those charged with infringement, have long employed the phrase pejoratively. But a valid patent never confers a monopoly in the traditional, historical, anticompetitive sense, as was explained by the Supreme Court in *United States v. Dubilier Condenser Corp.,* 289 U.S. 178, 186, 53 S.Ct. 554, 557, 77 L.Ed. 1114 (1933):

"Though often so characterized, a patent is not, accurately speaking, a monopoly, for it is not created by the executive authority at the expense and to the prejudice of all the community except the grantee of the patent. *Seymour v. Osborne,* 11 Wall. 516, 533, 20 L.Ed. 33. The term monopoly connotes the giving of an exclusive privilege for buying, selling, working or using a thing which the public freely enjoyed prior to the grant. Thus a monopoly takes something from the people. An inventor deprives the public of nothing which it enjoyed before his discovery, but gives something of value to the community by adding to the sum of human knowledge. * * * He may keep his invention secret and reap its fruits indefinitely. In consideration of its disclosure and the con-

sequent benefit to the community, the patent is granted." [Footnote and citations omitted.]

Like any property, a patent may be used in a plan to achieve a monopoly violative of our antitrust laws. But proof of that fact is required. *See Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.,* 382 U.S. 172, 177-78, 86 S.Ct. 347, 15 L.Ed.2d 274 (1965). A patented product rarely enjoys a dominant share in the relevant market. As noted in *Northern Pac. Ry. v. United States,* 356 U.S. 1, 10 n. 8, 78 S.Ct. 514, 520, 2 L.Ed.2d 545 (1958):

"Of course it is common knowledge that a patent does not always confer a monopoly over a particular commodity. Often the patent is limited to a unique form or improvement of the product and the economic power resulting from the patent privileges is slight."

Congress has provided that patents "shall have the attributes of personal property." 35 U.S.C. § 261. The patent right, solely that of excluding others, is the fundamental element of all human rights called "property." The statutory, and therefore proper, characterization is not "patent monopoly," but "patent property."

*John Deere, supra,* 383 U.S. at 18,[26] 86 S.Ct. 684.

### Conclusion

We concur in the district court's holding that the inventions recited in claims 4 and 21 would have been obvious at the time the inventions were made to a person having ordinary skill in the art, and that the claims were therefore invalid under 35 U.S.C. § 103. We concur also in the district court's implicit holding that the jury could not reasonably have found facts sufficient to support a legal conclusion that claims 4 and 21 are valid. Accordingly, we *affirm* the district court's grant of Peterson's motion for judgment notwithstanding the verdict.

AFFIRMED.

---

**26.** The opinion below, in the midst of its novelty discussion, states: "The Court went on to state that commercial success, without invention, will not make patentability." (410 F.Supp. at 594, 193 USPQ at 446, citing cases.) The statement must necessarily mean only that commercial success *not due to the merits of an invention* cannot be an indicium of nonobviousness. The statement cannot be taken literally without attributing circuitous reasoning to the Court. The Court in *John Deere* recognized that commercial success could serve as evidence of nonobviousness and thus of patentability. At the time the statement first appeared (1950), courts equated "invention" to patentability, see note 20, *supra.* Taken literally, therefore, the statement would read "evidence of patentability (commercial success) without patentability (invention) will not make patentability." The statement has led on occasion to a total disregard of the evidence of nonobviousness represented by commercial success. If an invention is entirely lacking in novelty, no amount of commercial success can serve as evidence of its patentability. When the issue is obviousness-nonobviousness, however, a determination that an invention would have been obvious should be made, as should the determination of any issue in any type of case, only after consideration of *all* relevant evidence, see note 21, *supra.*